**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **Case No. 1:21-cr-747 (JEB)** |
| **EMILY HERNANDEZ,** | : | |
| | : | |
| **Defendant.** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.  For the reasons set forth herein, the government requests that this Court sentence Emily Hernandez ("Hernandez") to a 45-day term of incarceration, one year of supervised release, 60 hours of community service, and $500 restitution.

**I.     Introduction**

The defendant, Emily Hernandez, her uncle, William Merry ("Merry") (Case No. 21-cr-748 (JEB)), and his friend Paul Westover ("Westover") (Case No. 21-cr-697 (JEB)),[1] participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 presidential election, injured more than one hundred police officers, and resulted in property damage totaling more than one million dollars.

---

[1] Westover pleaded guilty to one count of Parading, Demonstrating, or Picketing in the Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G), on December 6, 2022, before this Court. Merry pleaded guilty to one count of violating 18 U.S.C. § 641, Theft of Government Property, on January 5, 2022, also before this Court.  Both are due to be sentenced on March 21, 2022.

On January 10, 2022, Hernandez pleaded guilty to one count of violating 18 U.S.C. § 1752(a)(1): Entering and Remaining in a Restricted Building or Grounds, a Class A misdemeanor. As explained herein, the government's proposed sentence is appropriate in this case because Hernandez: (1) was well aware that police officers were trying to disperse the crowd assembled outside of the Capitol, and yet she surged towards the Capitol Building anyway; (2) stormed past multiple police lines after witnessing rioters forcibly remove barricades; (3) penetrated the U.S. Capitol all the way to the Speaker's suite and exited through a broken window; (4) picked up a shard of Speaker Pelosi's office sign, which had just been smashed by another rioter, and then proudly displayed the stolen shard on Capitol grounds; and (5) stole other items from the Capitol and Capitol grounds, including a "Keep Off Fence" sign and a "Please Do Not Touch" sign from the foot of a statue in the Capitol.

To be clear, in arriving at its sentencing recommendation, the government also considered several mitigating factors, including Hernandez's voluntary surrender to the FBI, her early cooperation with law enforcement,[2] and her willingness to accept responsibility and enter a plea agreement at the first available opportunity. The government also considered the role of her uncle, a trusted authority figure in her life, in inducing her to commit crimes, particularly in light of her relative youth. It should also be noted, however, that while on pretrial release in this matter and shortly before her change of plea hearing, Hernandez was involved in a car accident that resulted in a fatality. She allegedly was driving while intoxicated and in the wrong direction on the interstate when the accident occurred.[3]

---

[2] Hernandez cooperated with law enforcement from the beginning of this investigation, including by turning over the items she stole from the Capitol and Capitol grounds during her voluntary surrender and providing the FBI her cell phone to be imaged and reviewed.

[3] The government understands that Ms. Hernandez was immediately transported to the hospital following the accident and has yet to be charged, pending the results of a toxicology report.

Even if she did not personally engage in violence or property destruction during the riot, Hernandez witnessed and celebrated the violence of that day.  Despite clear efforts from the U.S. Capitol Police—e.g., the use of munitions and tear gas—to hold back the crowd, Hernandez joined the mob in storming past several lines of law enforcement to breach the U.S. Capitol.  She ultimately breached the Capitol and reached the Speaker's suite, where she witnessed rioters pry Speaker Pelosi's office sign from its post above an entryway and smash it against the wall.  At her uncle's urging, Hernandez picked up a shard of that sign, which they removed from the Capitol and proudly displayed like a trophy.

Despite witnessing mob violence and being forced to crawl out of a broken window to exit the Capitol, Hernandez continued to act if as the siege of the Capitol was something to celebrate.  Indeed, she appeared in an "interview" on Capitol grounds in which the interviewer stated: "you want to know how to defend your country?  You storm in there and you take your country back.  I'm here with the heroes who actually stormed [unintelligible] and we are actually going to take our country back."[4]  When asked to display her loot—i.e., the shard of Speaker Pelosi's sign—Hernandez giggled as she withdrew it from her coat and posed for pictures with it. She ultimately took the shard and two other signs she stole from the Capitol back to St. Louis, Missouri.

The Court must also consider that Hernandez's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings.  But for

---

[4] The interviewer does not appear to be affiliated with any news media organization, though public records indicate she is a producer for a TV commercial/advertising company.  It thus appears she was "interviewing" individuals on Capitol grounds for social media or promotional purposes.

her actions and those of her fellow rioters, the riot likely would have failed.  Here, his participation in a riot that actually succeeded in halting the Congressional certification combined his celebration and endorsement of the violence on that day demonstrates why a term of incarceration is warranted.

## II.    Factual and Procedural Background

### a.   *The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol.  *See* Statement of Offense ("SOO"), ECF No. 35, at 1-7.  As the Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent—contributed, directly and indirectly, to the violence and destruction of that day.

### b.   *Hernandez's Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, Hernandez, Merry, and Westover (hereinafter, the "trio") traveled to Washington, D.C., from their homes in Missouri to attend the "Stop the Steal" rally.  At the time she traveled, Hernandez was aware that the Electoral College votes would be counted the next day at the U.S. Capitol.  SOO ¶ 9.

Once on Capitol grounds, Hernandez saw rioters arguing with the police on the outer perimeter of the Peace Circle.  *See* SOO ¶ 10; *see also* Ex. 1.[5]  She then witnessed members of this group breach the police line, forcing the police to retreat.  *See* Ex. 1.  Westover recorded the tail end of this moment, which occurred at approximately 12:50 p.m.  *See* Ex. 1.  The trio stepped over the now-dismantled fencing and bike racks as they continued on towards the Capitol building.  *Id.*

---

[5] All exhibits cited in this memorandum will be provided to the Court in advance of the sentencing hearing.

The trio followed the crowd to a set of steps outside the Capitol, just below the northwest scaffolding.  In this spot, Westover recorded a video stating that the trio was "on the front line." Ex. 2.  Heavily outnumbered police can be seen in the background trying to deter the crowd from breaching a bike rack barricade.  *See id.* and Figure 1.  Indeed, the trio was firmly enmeshed within the front line of individuals who have been identified as Proud Boys, including Joe Biggs and Ethan Nordean,[6] and who were up against this barricade, as seen in Figures 1 and 2 (both derived from Ex. 2).  Hernandez then witnessed rioters forcibly remove the police barricade in front of her and proceeded to follow them up the Capitol steps and past the retreating police officers.  *See* Ex. 2; Figure 2; SOO ¶ 11.



*Figure 1*

---

[6] Both have been charged in case number 21-cr-175 (TJK) with Obstruction of an Official Proceeding and Destruction of Government Property, among other charges.



*Figure 2*

Following these initial breaches, the trio joined a large crowd on the West Plaza at the foot of the inaugural stage, behind yet another police line, by approximately 1:00 pm.  *See* Ex. 2; *see also* Ex. 3.  For approximately an hour, the rioters engaged in continuing skirmishes with police over the fence lines.  By 2:03 pm, police had declared that a riot had erupted and repeatedly broadcast a recorded dispersal order from a large speaker near the front of the inaugural stage.

In this area, Hernandez witnessed U.S. Capitol Police officers deploy munitions and tear gas into the crowd.  Indeed, Westover, with Hernandez and Merry at his side, recorded videos on his cell phone showing these efforts to disperse the rioters.  In one video, Westover stated that things were "getting a little crazy again…somebody fired off some large fireworks"— presumably referring to law enforcement's deployment of munitions, as heard in the video.  Ex. 3.  Sometime thereafter, Westover recorded a video featuring Hernandez in which he lamented getting "tear gassed again," adding "that's always fun."  *See* Ex. 4.  In the background, rioters can be seen climbing the scaffolding set up in preparation for the presidential inauguration.  *Id.*

The trio proceeded to climb the stairwell beneath the northwest scaffolding, at times crawling underneath scaffold poles, while Westover recorded the moment on this cell phone. *See* Ex. 5.  In the video, Westover exclaimed, "we're storming the gates of the Capitol here." *Id.* The trio then ascended a set of steps to reach the Upper West Plaza.  *See* Ex. 6.  While walking up these steps, Merry exclaimed, "we're going in," while Westover shouted, "we're coming, Nancy!" *Id.*  Other rioters chimed in, "I want Mitch"; "and now Pence." *Id.*

The trio then crossed the Upper West Plaza and breached the Capitol through the Senate Wing door at approximately 2:20 pm.  *See* Ex. 7.  In a video recorded by Westover of this moment, an alarm is ringing loudly, broken glass is visible on the ground, and the Senate Wing door and adjacent windows have clearly been smashed.[7] *Id.*; *see also* Figure 3 (a still of Capitol surveillance footage depicting Hernandez as she entered).  To the left and right of the trio, rioters entered the building through the broken windows.



*Figure 3*

---

[7] The windows were smashed out by rioters only seven minutes prior to the trio's breach.

The trio then made their way through the Crypt and then proceeded to the Speaker's Suite, while the mob chanted for "Nancy."  Ex. 8.  Hernandez smiled and shouted with excitement as a rioter pried the Speaker's office suite sign off its post above a doorway and then smashed it against a wall.  *See id.*; *see also* Exs. 9, 10.[8]  She then said something to the effect of "I'm taking it," as Merry goaded her to "get a piece of that."  Ex. 8.  Hernandez proceeded to pick up a shard of the now-broken sign and gleefully displayed it to a reporter.  Ex. 10 and Figure 4.



*Figure 4*

The trio ultimately reached the Rotunda, taking photos and videos.  Ex. 11.  Hernandez live streamed a video on SnapChat depicting her snatching a "Please Do Not Touch" sign from the foot of a statue in the Capitol, before panning to the loot in her hands.  *See* Ex. 12; Figures 5 and 6.

---

[8] Exhibit 9 was recorded by British media outlet ITV News and is publicly available here: https://www.youtube.com/watch?v=UBp42536IhE.



*Figure 5*



*Figure 6*

While in the Rotunda, Merry picked up a phone on a desk and pretended to call

"Nancy"—i.e., Speaker Pelosi.  *See* Ex. 8.  In his faux phone call, with Hernandez giggling in the

background, Merry ranted: "I've got an emergency: Nancy Pelosi is a c**t…let it all be known that Nancy Pelosi is a c**nt…I tried calling the c**t Nancy but she wouldn't answer.  Nancy, Nancy, c**t."  *Id.*  When Merry hung up the phone, Hernandez stated, "you should've got that on video."  (He did.)

The trio ultimately exited the Capitol by crawling through a broken window next to the Senate Wing doors at approximately 2:55 p.m.  In total, Hernandez spent nearly 40 minutes inside of the Capitol.  Hernandez has admitted that she knew at the time she entered the Capitol that she did not have permission to do so.  SOO ¶ 21.

Shortly after exiting the Capitol, Hernandez proudly displayed the shard of the Speaker's office sign for the crowd to see.  *See* Figure 7.  She also participated in an "interview" in which the interviewer stated that she was a "hero[]… tak[ing] our country back" by storming the Capitol.  *See* Ex. 13.  When prodded by the interviewer to open her jacket to show "proof" that they were heroes, Hernandez unveiled her loot, smiling for the camera.  *See id.* and Figure 8.



*Figure 7*

10



*Figure 8*

The trio ultimately drove back to St. Louis with the stolen items in tow.  Hernandez later turned over those items to the FBI when she self-surrendered.

    c.   *The Charges and Plea Agreement*

On January 15, 2021, Hernandez was charged by complaint with violating 18 U.S.C. §§ 641, 1752(a)(1) & (2), and 40 U.S.C. §§ 5104(e)(2).  On January 19, 2021, she voluntarily surrendered to the FBI in St. Louis, Missouri.  On December 29, 2021, Hernandez was charged by Information with one count of violating 18 U.S.C. § 1752(a), Entering and Remaining in a Restricted Building or Grounds, a misdemeanor.  She pleaded guilty to this charge on January

10, 2022.  By plea agreement, Hernandez agreed to pay $500 in restitution to the Department of the Treasury.

### III.      Statutory Penalties

Hernandez now faces sentencing on a single count of violating 18 U.S.C.  § 1752(a)(1). As noted by the plea agreement and the U.S. Probation Office, she faces up to one year of imprisonment and a fine of up to $100,000.  She must also pay restitution under the terms of her plea agreement.  *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."  *United States v. Gall*, 552 U.S. 38, 49 (2007).  "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49.

The government agrees with the Probation Office's calculation of the applicable Sentencing Guidelines range:

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2B2.3(a)) | 4 |
| Specific Offense Characteristic (2B2.3(b)(1)(A))[9] | +2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| **Total Adjusted Offense Level** | **4** |

*See* Final Presentence Investigation Report ("PSR"), ECF No. 38, at ¶¶ 37-46.

---

[9] As indicated in Hernandez's plea agreement, the specific offense characteristic applies because the trespass occurred "at any restricted building or grounds" under U.S.S.G. §2B2.3(b)(1)(A)(vii).  ECF No. 34 at 3.  On January 6, 2021, the U.S. Capitol was restricted because protectees of the United States Secret Service were visiting.  *See* 18 U.S.C. § 1752(c)(1)(B).  Because a two-level increase applies under either theory, there is no difference to the final offense level.

The U.S. Probation Office calculated Hernandez's criminal history as a category I, which is not disputed.  PSR at ¶ 49.  Accordingly, the U.S. Probation Office calculated Hernandez's total adjusted offense level, after acceptance, at 4, and her corresponding Guidelines imprisonment range at 0-6 months.  PSR at ¶ 86.  Hernandez's plea agreement contains an agreed-upon Guidelines calculation that mirrors the U.S. Probation Office's calculation.

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."  *United States v. Rita*, 551 U.S. 338, 349 (2007).  As required by Congress, the Commission has "modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like."  *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (internal quotation marks omitted); 28 U.S.C. § 994(m).  In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards."  *Kimbrough*, 552 U.S. at 108.  Accordingly, courts must give "respectful consideration to the Guidelines."  *Id.* at 101.  As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case.

> Because they have been produced at Congress's direction, they
> cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005).  "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that *significantly* increases the likelihood that the sentence is a reasonable one."  *Rita*, 551 U.S. at 347 (emphasis in original).  In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'"  *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark.  As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot.  This includes hundreds of felonies and misdemeanors that will be subjected to a Guidelines analysis.  In order to reflect Congress's will, the Guidelines will be a powerful driver of consistency and fairness moving forward.

## IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this Class A misdemeanor case, sentencing is also guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating a sentence.  Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6).  In this case, as

described below, all of the Section 3553(a) factors weigh in favor of the government's proposed sentence of a 45-day term of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6, 2021, is a criminal offense unparalleled in American history.  It represented a grave threat to our democratic norms—indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances.  Before entering the Capitol, Hernandez crossed through numerous barriers and barricades and heard the throes of a mob, including the heated rhetoric of Merry and Westover.  As the video exhibits clearly show, Hernandez observed extensive efforts by U.S. Capitol Police to hold back the crowd, saw shattered windows at her location of entry, and smelled chemical irritants in the air.  She was far from a mere tourist that day.

Additionally, while looking at Hernandez's individual conduct, this Court must assess such conduct on a spectrum.  This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with or ignored commands from police officers; and (9) whether the defendant has demonstrated  sincere

remorse or contrition.  While these factors are not exhaustive or dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had Hernandez personally engaged in violence or destruction, she would be facing additional charges and/or penalties associated with that conduct.  The absence of violent or destructive acts on Hernandez's part is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish her from most other misdemeanor defendants.  Hernandez's lack of violence and property destruction is the only reason she was permitted to plead guilty to a misdemeanor rather than a felony.  That said, having removed government property from the Capitol, Hernandez is significantly more culpable than the vast majority of misdemeanor defendants charged in the Capitol riot cases.

As Exhibits 1 through 7 show, Hernandez was well aware of the force required to overwhelm law enforcement and make entry into the Capitol.  She personally witnessed rioters forcibly remove multiple police barricades and proceeded to storm past outnumbered officers. Hernandez stayed in the area of continuing skirmishes with police for over an hour, despite increasing violence against law enforcement and clear signals that she was unlawfully present.  As the police increased the force necessary to repel the crowd, Hernandez would have heard a dispersal order broadcast.  Based on the videos recorded by her travel companions, it is clear she would have been privy to the police firing increasingly powerful munitions into the crowd as well as the acrid smell of pepper spray in the air.  *See* Exs. 3-4.  Despite this, Hernandez chose to advance past the police line, which crumbled shortly before she ascended the steps beneath the scaffolding and entered the building.

Hernandez entered the building less than ten minutes after it was first breached at her location of entry.  While no police officers blocked her path, there were clear signs of violent entry.

There can be no question, based on Exhibit 7, that Hernandez saw that the window adjacent to the door she entered through had just been smashed out.  The video also makes clear that Hernandez heard the alarm sounding throughout the Capitol: a loud, high-pitched, continuous beeping similar to a smoke alarm.  *Id.*  She was aware that police on Capitol grounds were attempting to hold the mob back with chemical irritants and rubber bullets.  Even after Hernandez witnessed rioters violently smash Speaker Pelosi's office suite sign, she did not turn back or recoil in horror.  Quite to the contrary, she celebrated it and decided to grab a piece.  Hernandez then proudly displayed the shard of the sign like a trophy for a nearby reporter and thereafter on Capitol grounds.  She also stole other items from the Capitol building and grounds.

Accordingly, the nature and the circumstances of this offense establish the clear need for a significantly deterrent sentence in this matter.

### B.  The History and Characteristics of the Defendant

As set forth in the PSR, Hernandez lacks a criminal history.  On January 5, 2022, just days before her plea hearing in this matter, however, Hernandez was involved in a car accident that resulted in a fatality.  PSR ¶ 50.  Press reports and the initial Missouri State Highway Patrol report state that Hernandez was driving while intoxicated when the accident occurred, and that she was driving in the wrong direction on an interstate highway.  *Id.*  No charges have been filed to date, as the results of a toxicology report are pending.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law.  "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."  FBI Director Christopher Wray, Statement before House Oversight &

Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats. oversight.house.gov/files/Wray%20Testimony.pdf.  As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *Cf. United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238 (TFH), Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually – should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence—the need to protect the public from further crimes by this defendant.  18 U.S.C. § 3553(a)(2)(B-C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

a.  *General Deterrence*

The demands of general deterrence generally weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration, or some other combination of punitive terms.  For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes in this country: the peaceful transfer of power to a newly elected President.  As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188 (RDM):

> [D]emocracy requires the cooperation of the governed. When a mob
> is prepared to attack the Capitol to prevent our elected officials from
> both parties from performing their constitutional and statutory duty,
> democracy is in trouble. The damage that [the defendant] and others

18

> caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70.  Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation."  *Id.* at 70.

The gravity of these offenses demands deterrence.  This was not a protest.  *See United States v. Paul Hodgkins*, 21-cr-188 (RDM), Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss).  And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences.  There is possibly no greater factor that this Court must consider in these cases.

        b.  *Specific Deterrence*

Hernandez's actions, both during the riot and more recently, clearly demonstrate the need for specific deterrence for this defendant.  Hernandez celebrated the violence of the day when she picked up the Speaker's shattered sign and held it up for a reporter.  *See* Figure 4.  Despite witnessing the destruction of an angry mob in search of Speaker Pelosi, she posed for multiple photographs with the shattered sign bearing the Speaker's name.  She also stole other items that day.  Accordingly, a significantly deterrent sentence is necessary for this specific defendant.

**E.  The Need to Avoid Unwarranted Sentencing Disparities**

As the Court is aware, the government has charged hundreds of individuals for their roles in this unprecedented assault on our Capitol, ranging from unlawful entry misdemeanors, such as

in this case, to assaults on police officers, to conspiracy to obstruct the congressional proceedings.[10]  Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind.  Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment.  The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes.  A probation-only sentence thus should not become the default.[11]  *See United States v. Anna Morgan-Lloyd*, 1:21-cr-164 (RCL), Tr. 6/23/2021 at 19 (the court should not "create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth).

The government and the sentencing courts have made meaningful distinctions between offenders.  Those who engaged in felonious conduct are generally more dangerous and thus treated more severely in terms of their conduct and subsequent punishment.  Those who trespassed, but engaged in aggravating conduct, merit serious consideration of institutional incarceration.  Those who trespassed, but engaged in less serious aggravating conduct, deserve a sentence more in line with minor incarceration or home detention.

---

[10] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  This table shows that the sentence requested in this case would not result in unwarranted sentencing disparities.

[11]  Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-164 (RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-97 (PLF); *United States v. Donna Sue Bissey*, 1:21-cr-165 (TSC), *United States v. Douglas K. Wangler*, 1:21-cr-365 (DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-365 (DLF). The government is abiding by its agreements in those cases but has made no such agreement in this case.  *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

Sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against police officers, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence. Here, even though Hernandez, Merry, and Westover were not charged as co-conspirators, their criminal conduct was entirely intertwined and mutually reinforcing. For that reason, this Court should structure the sentence of each of these defendants in a manner that reflects the relative culpability of each vis-à-vis the other two.

This Court should consider the sentences imposed in other Capitol Breach cases when fashioning a sentence for Hernandez. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may consider the sentences imposed in other Capitol Breach cases for comparison. The Government has requested, and the courts have imposed, sentences of incarceration in most cases where defendants gained entry to sensitive spaces inside of the Capitol Building. *See, e.g.*, *United States v. Mazzocco*, 1:21-cr-54 (TSC) (sentenced to 45 days of incarceration where defendant entered conference room area known as Spouse's Lounge); *United States v. Pham*, 1:21-cr-109 (TJK) (sentenced to 45 days of incarceration where defendant walked into office area with desks, a computer, and numerous paper

files); *United States v. Bonet*, 1:21-cr-121 (EGS) (sentenced to 90 days of incarceration where defendant smoked marijuana in Senator's private office); *United States v. Ericson*, 1:21-cr-506 (TNM) (sentenced to 20 days of weekend incarceration where defendant entered Speaker's conference room and other office space); *but see United States v. Marquez*, 1:21-cr-136 (RBC) (government requested four months of incarceration for defendant who entered Senator Merkley's office; sentenced to 18 months' probation, citing mental health issues).  Here, worse than entering a sensitive (but empty) space, Hernandez helped remove from the Capitol a symbolic item bearing the name of a[primary target of the mob—Speaker Pelosi—whom rioters were threatening to shoot in the head and hang.[12]

The Court should also consider the sentences imposed in Capitol Breach cases involving the unlawful conversion of government property where the defendant ultimately pleaded guilty to a violation of 18 U.S.C. § 1752(a)(1) pursuant to a plea agreement, like Hernandez.  For example, in *United States v. Johnson* (21-cr-648), Judge Walton imposed a sentence of 75 days of incarceration, 200 hours of community service, a $5,000 fine, and $500 in restitution.  In that case, Johnson breached the Capitol and made it as far as the doors to the House Chamber.  *See* Gov't Sentencing Memorandum, ECF No. 49, 21-cr-648.  Like Hernandez, he saw officers use tear gas to disperse the crowd and yet surged ahead, entering through the same door as Hernandez. Although Johnson was not accused of engaging in violence or destruction of property himself, like Hernandez, he witnessed rioters attempting to destroy government property and celebrated their actions.  Johnson also carried around the Speaker's lectern and deposited it in the Rotunda to pose

---

[12] *See, e.g.*, *United States v. Pauline Bauer*, 21-cr- 386, ECF No. 2-1 ("They need to hang…Bring her out…Bring Nancy Pelosi out here now. We want to hang that f****** b****."); *United States v. Cleveland Meredith*, 21-cr-159, ECF No. 47 ("Thinking about heading over to Pelosi C[**]T's speech and putting a bullet in her noggin on Live TV")

for photos with it, earning him the viral moniker, "podium thief."  Unlike Johnson, however, Hernandez actually removed government property from the Capitol building and was seen wielding it joyfully on Capitol grounds.  *See* Figures 7-8.  Similarly, in *United States v. Courtright* (21-cr-72), Judge Cooper sentenced the defendant, a college student like Hernandez, to 30 days of incarceration where she picked up and carted around a "Members Only" sign that she only returned after being ordered to do so by law enforcement on her way out of the Capitol.  By contrast, Hernandez took her loot all the way back to St. Louis.

The Court should also refer to the sentences it imposed in *United States v. Derek Jancart and Erik Rau*, 1:21-cr-148 (JEB), as guideposts.  Jancart and Rau each received sentences of 45 days of incarceration.  They observed significant violence as they approached the Capitol building, as did Hernandez.  Like Hernandez, Jancart and Rau entered through the Senate Door shortly after it was breached.  The duo made their way to a highly sensitive area of the Capitol building— Speaker Pelosi's conference room—whereas Hernandez reached Speaker Pelosi's office suite where she held up smashed government property like a trophy.  Stealing several items from the Capitol, as Hernandez did, surely is equivalent to or worse than the conduct of these two defendants.

The goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge."  *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).  The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender."  *United States v. Gardellini*, 545

F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.      Conclusion

Sentencing requires the Court to balance the § 3553(a) factors carefully. Balancing these factors, the government recommends that this Court sentence Emily Hernandez to 45 days of incarceration, one year of supervised release, 60 hours of community service, and $500 in restitution. Such a sentence promotes respect for the law and deters future crime by this defendant and others by imposing restrictions on her liberty, while recognizing her acceptance of responsibility.

Respectfully submitted,

MATTHEW GRAVES
UNITED STATES ATTORNEY

By:     *Jessica Arco*
_____
Jessica Arco
D.C. Bar No. 1035204
Trial Attorney – Detailee
U.S. Attorney's Office
555 4th Street NW
Washington, DC 20530
Jessica.arco@usdoj.gov